In the Matter of the DEPARTMENT OF SOCIAL SERVICES, on Behalf of SANDRA C., Respondent, v THOMAS J. S., Appellant.

Second Department, March 19, 1984

APPEARANCES OF COUNSEL

*Patrick Kevin Brosnahan, Jr.,* for appellant.

*David J. Gilmartin, County Attorney* (*Richard Epstein* on the brief), for respondent.

*Robert Abrams, Attorney-General* (*Ronald Glickman* of counsel), in support of the constitutionality of sections 517 and 532 of the Family Court Act.

### OPINION OF THE COURT

BRACKEN, J.

On this appeal we are called upon to determine the constitutionality of sections 517 and 532 of the Family Court Act.

In June of 1981, the Suffolk County Department of Social Services instituted a paternity proceeding pursuant to article 5 of the Family Court Act, on behalf of Sandra C., a recipient of public assistance, to adjudicate appellant Thomas J. S. to be the father of a female child born out of wedlock to Sandra C. on October 29, 1976.

After refusing to attend an appointment to undergo blood-grouping tests, scheduled for December 10, 1981, appellant moved, *inter alia,* to vacate a demand that he submit to a human leucocyte antigen (HLA) test. Appellant's motion was premised on the ground that section 532 of the Family Court Act (as amd by L 1981, ch 9, § 2), to the extent that it authorizes the results of HLA testing to be used as affirmative proof of paternity, deprives a putative father of his Fourteenth Amendment right to due process of law and equal protection of the laws and his Fifth Amendment privilege against self incrimination. Additionally, appellant sought an order dismissing the petition as time barred, upon the ground that the 1981 amendment to section 532 rendered section 517 of the Family Court Act, which provides for a 10-year Statute of Limitations where a public welfare official is the petitioner, violative of a putative father's right to due process of law. The Family Court denied appellant's motion, finding both sections to be constitutional. We agree.

## SECTION 532 OF THE FAMILY COURT ACT

In 1981, section 532 of the Family Court Act was amended by adding a provision that: "[T]he results of the human leucocyte antigen blood tissue test may be received in evidence to aid in the determination of whether the alleged father *is or is not* the father except in cases where exclusion has already been established by other blood grouping tests" (L 1981, ch 9, § 2, eff March 2, 1981; emphasis added).

Prior to this amendment, section 532 provided that blood-grouping test results could be admitted in evidence "only in cases where definite exclusion is established" (see L 1962, ch 686, as amd by L 1976, ch 665, § 6). The effect of the 1981 amendment was to create an exception to the foregoing rule with respect to the results of an HLA test (L 1981, ch 9, § 2).

### Due Process

Appellant contends that because the results of HLA testing may provide only a 90% chance of exclusion, the 1981 amendment, which allows the affirmative use of test results as evidence of paternity, will deprive 10% of the tested putative fathers of their constitutional right to due process of law. Furthermore, appellant maintains that, in the past, blood-grouping tests could be used solely for exclusionary purposes, thereby protecting the alleged father from fraudulent claims, and that this amendment violates such long-standing policy by authorizing the results to be used as direct evidence of paternity.

Initially, we note that prior to the 1981 amendment, section 532, which by its provisions precluded blood test results from being admitted in evidence as affirmative proof of paternity, was not an expression of an evidentiary rule that blood tests could be used only as a shield for the putative father's protection. Rather, the section was reflective of the fact that the only blood test available at the time of the original enactment of section 532 in 1962 (L 1962, ch 686) and its amendment in 1976 (L 1976, ch 665, § 6), was the Landsteiner blood-grouping test, a test involving only the red blood cells. While the test was a reliable and accepted scientific procedure, it was and still is not sophisticated enough to exclude more than 60% of random males

because such red blood cell testing involves only a limited number of variables (*Matter of Pratt v Victor B.*, 112 Misc 2d 487, 488; *Matter of Edward K. v Marcy R.*, 106 Misc 2d 506; *Lascaris v Lardeo,* 100 Misc 2d 220, 222; 1 Schatkin, Disputed Paternity Proceedings [4th ed, rev], § 8.13 [Oct., 1983 Supp]). The Landsteiner test, therefore, could establish the fact of nonpaternity in a case where the putative father was excluded by the results; conversely, if a putative father was not so excluded, the test was not sufficiently reliable to establish the fact of paternity because there existed a 40% chance, more or less, that based upon untested genetic variables, the putative father might still be excluded. Thus the Landsteiner procedure simply was not precise enough to have probative value as affirmative proof of paternity. Consequently, former section 532 authorized the admission of test results only in a case where such test results excluded a putative father (*Matter of Pratt and Victor B., supra,* p 488; *Matter of Jane L. v Rodney B.,* 108 Misc 2d 709, 710; *Matter of Edward K. v Marcy R., supra,* p 509; *Matter of Goodrich v Norman,* 100 Misc 2d 33, 36; memorandum of Assemblyman Saul Weprin, NY Legis Ann, 1981, pp 43-44).

In contrast to previously employed blood-grouping tests, however, the HLA test is far more comprehensive because it is based upon tissue typing of the white blood cells and involves a much greater number of variables (*Matter of Beaudoin v Tilley,* 110 Misc 2d 696, 698; *Matter of Goodrich v Norman, supra,* p 37). The HLA test has been described as follows: "HLA is a super-system as compared with all the others. It involves many antigens on the lymphocytes (one of the varieties of white cells). These antigens are controlled by several close-linked genetic loci (A,B,C,D...) Presently useful for paternity testing are about 40 antigens of the A and B loci, and these determine a very large number of different types, the most common of which has a frequency of less than 1 percent in the population. These antigens of the A and B series demonstrate exclusion in over 95 percent of cases in which the man is not the father * * * There is no doubt that the percentage of exclusion by HLA will soon reach 99 percent, and 99.9 percent is not a wild guess" (1 Schatkin, Disputed Paternity Proceedings

[4th ed, rev], § 8.08). The accuracy of the test is also widely accepted in scientific communities, as evidenced by its use in matching donors and recipients in cases involving organ transplants (*Matter of Goodrich v Norman, supra,* p 37).

█ Like other blood-grouping tests, the HLA test is an exclusionary one, the purpose and effect of which is to establish nonpaternity. However, utilization of the HLA and associated sophisticated tests can increase the probability of exclusion to such a high degree as to affirmatively prove paternity where a putative father is not excluded by the test results. When all tests are utilized, including all blood-typing tests, and no exclusion results, the average theoretical degree of probability of actual paternity or actual nonpaternity will be 99.999999999% (1 Schatkin, Disputed Paternity Proceedings [4th ed, rev], § 8.13 [Oct., 1983 Supp, p 71]; Sussman & Gilja, Blood Grouping Tests for Paternity and Non-Paternity, Table III, Usefulness of Blood Typing in Paternity Cases, NY J of Med, March, 1981, p 343). The difference in the percentage depends upon the blood type of the particular individuals tested and the number of related blood-group systems which are used in addition to the HLA test (*Matter of Jane L. v Rodney B.,* 108 Misc 2d 709, 712, *supra,* citing Miale, Jennings, Rettberg, Sell & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam LQ 247, 257).[*]

It is clear then that HLA test interpretations are not based upon arbitrarily assigned numerical probability values or upon a statistical theory unsupported by the evidence, but are based upon objectively ascertainable data

---

[*] The joint report of the American Medical Association (AMA) and American Bar Association (ABA) recommended that seven serologic systems, i.e., ABO, Rh, MCSS, Kell, Duffy, Kidd and HLA, be used for routine investigations. The report stated that it does not "recommend in all medicolegal problems of disputed parentage that the entire set of tests is mandatory. It is often possible to establish exclusion with the basic blood-group systems (ABO, Rh, and MCSS). When these basic tests do not allow exclusion, extended testing may be done (using Kell, Duffy and Kidd systems) to increase the mean probability of exclusion to the 63-72% level. In the event no exclusion is produced at that stage, additional testing using the HLA System * * * may be done to raise the mean probability of exclusion to at least the 90 percent level" (Miale, Jennings, Rettberg, Sell & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam LQ 247, 256-257; see, also, *Lascaris v Lardeo,* 100 Misc 2d 220, 222-225). This principle is reflected in the 1981 amendment to section 532 which authorizes affirmative use of HLA test results except where exclusion has already been established by other tests (L 1981, ch 9, § 2).

and a statistical theory based upon research and experiment (*Cramer v Morrison,* 88 Cal App 3d 873, 884). Cognizance of the high degree of probative value of the HLA test on the issue of paternity has been taken (*Michaella M. M. v Abdel Monem El G.,* 98 AD2d 464; *Merrill v Ralston,* 95 AD2d 177, 181-182; *Matter of Commissioner of Social Servs. of County of Erie v Stephen H.,* 94 AD2d 936; *Matter of Bowling v Coney,* 91 AD2d 1195; *Matter of Sherry K. v Carpenter,* 90 AD2d 687, 688; *Matter of Joanne O. v Andrew H. W.,* 87 AD2d 615; *Matter of Kimiecik v Daryl E.,* 87 AD2d 284; *Matter of Karen K. v Christopher D.,* 86 AD2d 633). Moreover, prior to the enactment of the 1981 amendment of section 532 of the Family Court Act, several courts in this State had urged passage of a statute allowing the admissibility of the HLA test results as inclusionary evidence (*Matter of Edward K. v Marcy R.,* 106 Misc 2d 506, 509, *supra; Jane L. v Rodney B.,* 103 Misc 2d 9, 12; *Matter of Goodrich v Norman,* 100 Misc 2d 33, 38-39, *supra*). By its enactment of the 1981 amendment, the Legislature affirmatively recognized the scientific reliability and efficacy of the more sophisticated HLA test and its high degree of probative value on the issue of paternity (*Matter of Kimiecik v Daryl E.,* 87 AD2d 284, 285, *supra*).

We reject, therefore, the contention that the prejudicial effect of admitting the result of an HLA test would outweigh its probative value as inclusionary evidence, rendering section 532 violative of a putative father's right to due process of law: " '[T]here is a probability factor in even the most carefully structured scientific inquiry; seldom is it possible to exclude all possible chance for error in human endeavor. But there is no requirement in our law that the admissibility of scientific-test evidence must be predicated on a 100 percent degree of accuracy' " (*Cramer v Morrison,* 88 Cal App 3d 873, 884, *supra,* citing *People v Slone,* 76 Cal App 3d 611, 625; see, also, *State v Meacham,* 93 Wn 2d 735).

Moreover, since section 532 of the Family Court Act does not accord HLA test results the status of definitive or conclusive proof of paternity, such test results are only evidence which the trier of fact has at its disposal to aid in its determination, and the results are to be given such

weight as the trier of fact deems appropriate. We therefore conclude that the probative value of an HLA test result outweighs the danger of any undue prejudice. Accordingly, we hold that section 532 of the Family Court Act, as amended to authorize the use of HLA test results as inclusionary evidence of paternity, does not violate a putative father's Fourteenth Amendment right to due process of law.

*Equal Protection*

Section 532 of the Family Court Act authorizes any party in a paternity proceeding to move for an order directing the mother, her child and the alleged father to submit to HLA tests, the results of which can be used as affirmative evidence of paternity. However, the former provisions of section 418 of the Family Court Act, in effect as of the date that the Family Court rendered its determination in this case, provided that in support proceedings the court could order the parties to submit to HLA testing only upon its own motion or upon motion of the respondent.

Appellant contends that there is no rational distinction to justify this disparity of treatment among a class of citizens similarly situated. Therefore, he argues that section 532 deprives a putative father of his constitutional right to equal protection because it compels the putative father to submit to an HLA test upon the motion of the mother.

Appellant's contention has been rendered moot by the enactment of chapter 773 of the Laws of 1982, whereby the Legislature amended section 418 of the Family Court Act to permit any party in a support proceeding to move for an order directing the mother, her child and the alleged father to submit to HLA tests. Consequently, the Legislature has remedied the discrepancy between sections 418 and 532, which was the subject of appellant's objection. The fact that the amendment was passed after the decision by the Family Court does not save appellant's claim from mootness, as we apply the law now in effect, not as of the time the order was signed (see *Kremens v Bartley,* 431 US 119, 128-129; *Fusari v Steinberg,* 419 US 379, 387; *United States v Alabama,* 362 US 602, 604; *Strauss v University of State of N. Y.,* 2 NY2d 464; *Matter of Mitchell* [*Onondaga Dept. of Social Servs.*], 70 AD2d 367).

Notwithstanding the recent amendment of section 418 of the Family Court Act, this court is cognizant of an additional distinction remaining between that section and section 532, which, although not challenged by appellant, merits comment. In a paternity proceeding, section 532 requires the court to order blood tests upon motion of any party, whereas, in a support proceeding, where paternity is in issue, section 418 allows the court to exercise discretion in ordering such tests (see *Matter of Beaudoin v Tilley*, 110 Misc 2d 696, 699, *supra;* Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Part 1, Family Ct Act, § 418, p 139). This grant of judicial discretion in ordering blood tests under section 418 must be viewed in the context of article 4 of the Family Court Act, the overriding purpose of which centers on the issue of support (*Matter of Beaudoin v Tilley, supra*). Such discretion is necessary to enable the court to protect children born during marriage from spurious claims of illegitimacy by a parent seeking to avoid the legal obligation to pay support (*Matter of Beaudoin v Tilley, supra;* Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Part 1, Family Ct Act, § 418, p 139). The presumption of legitimacy of children born in wedlock is "one of the strongest and most persuasive known to the law" (*Matter of Findlay*, 253 NY 1, 7; see, also, *Matter of Fay*, 44 NY2d 137, 142; *State of New York ex rel. H. v P.*, 90 AD2d 434, 437; *Matter of Backus v Backus*, 72 AD2d 893; *Matter of Gray v Rose*, 32 AD2d 994; *Lory v Lory*, 119 Misc 2d 205, 211; *Matter of Edward K. v Marcy R.*, 106 Misc 2d 506, 507, *supra; Matter of Crouse v Crouse*, 51 Misc 2d 649, 650, 654). Therefore, the Legislature had a rational basis for conferring judicial discretion in ordering blood tests in support proceedings (Family Ct Act, § 418), while at the same time failing to grant such discretionary authority in paternity proceedings (Family Ct Act, § 532), in which the presumption is generally inapplicable.

*Fifth Amendment Privilege Against Self Incrimination*

Appellant next contends that section 532 of the Family Court Act violates his Fifth Amendment privilege against self incrimination. Additionally, he argues that section 532, which authorizes the court to compel a putative father

to submit to blood tests, the results of which would be admissible at trial to establish paternity, conflicts with section 531 of that act. Section 531 states, in pertinent part, that: "The mother or the alleged father shall be competent to testify *but the respondent shall not be compelled to testify*" (emphasis supplied).

It has long been established that an accused's privilege against self incrimination under the Fifth and Fourteenth Amendments is not implicated where he is subjected to a blood test to determine if he was driving while intoxicated (*Schmerber v California,* 384 US 757). The rationale of such a determination is that blood test evidence obtained for use in a criminal case is neither testimony nor evidence relating to some communicative act or writing, and, therefore, does not involve the privilege (*Schmerber v California, supra,* p 761).

The courts of this State have applied the *Schmerber* rationale to conclude that compulsory blood testing in paternity proceedings does not implicate the privilege: "Since a defendant in a criminal case can be compelled to submit to a blood test without violation of his Fifth Amendment privilege against self incrimination, it is clear that a respondent in a paternity action, which is now recognized to be a civil proceeding, can also constitutionally be compelled to submit to blood tests, including the highly probative H.L.A. test" (*Matter of Carmen Gonzalez M. v Malcolm E.,* 114 Misc 2d 800, 803; accord *Matter of Commissioner of Social Servs. of County of Erie v O'Neil,* 94 AD2d 480; *Matter of Commissioner of Social Servs. of County of Erie v Stephen H.,* 94 AD2d 936, *supra; Matter of Linda K. L. v Robert S.,* 109 Misc 2d 628; *Matter of Carmen I. v Robert K.,* 109 Misc 2d 259; *Matter of Jane L. v Rodney B.,* 108 Misc 2d 709, *supra; Matter of Carol B. v Felder R. J.,* 94 Misc 2d 1015).

With respect to the alleged conflict between sections 531 and 532 of the Family Court Act, the Court of Appeals has construed section 531 as giving the respondent in a paternity proceeding complete protection against being compelled to testify or produce communicative evidence, not only at the hearing, but also at the pretrial discovery stage of the proceeding (*Matter of Margaret B. v Gilbert W.,* 41

NY2d 971). When the Legislature amended section 532 in 1981, it presumably was aware of the privilege created by section 531, as well as the judicial construction of the latter enactment. The clear implication is that the Legislature viewed the amendment to section 532 either as creating an exception to the privilege that had been previously created by section 531, or, more likely, as falling completely outside the scope of the prohibition against testimonial compulsion as contained in section 531 and defined in *Schmerber v California (supra)*; (*Matter of Carmen Gonzalez M. v Malcolm E.*, 114 Misc 2d 800, 802, *supra;* see, also, *Matter of Leromain v Venduro*, 95 AD2d 80, 81). Accordingly, since blood test results are not testimonial in nature, we find that appellant's statutory privilege against self incrimination, embodied in section 531 of the Family Court Act, was neither violated nor implicated when he was ordered by the court to submit to HLA testing.

SECTION 517 OF THE FAMILY COURT ACT

*Due Process*

Section 517 of the Family Court Act provides several different limitation periods for commencement of paternity proceedings. The period to be applied in a given case depends upon whether the petitioner is a person alleging to be the father, a public welfare official or another person authorized to originate such a proceeding under section 522 of the act. Section 517 provides:

"§ 517. Time for instituting proceedings

"(a) Proceedings to establish the paternity of the child may be instituted during the pregnancy of the mother or after the birth of the child, but shall not be brought after the lapse of more than five years from the birth of the child, unless paternity has been acknowledged by the father in writing or by furnishing support, or unless the mother is under the age of eighteen years, in which case the time limitation is extended until five years after the mother reaches the age of eighteen years.

"(b) If the petitioner is a public welfare official, the proceeding may be originated not more than ten years after the birth of the child.

"(c) If the petitioner is a person alleging to be the father, the proceedings may be originated at any time prior to the child's eighteenth birthday and not thereafter."

The five-year limitation period contained in subdivision (a) of section 517 became effective on June 21, 1983 (L 1983, ch 305, § 1); at the time that the proceeding now under review was instituted, however, the period of limitation under subdivision (a) was two years (L 1962, ch 686, as amd by L 1979, ch 452, § 1).

The instant proceeding was brought by a public welfare official, and the 10-year limitation period therefore applied (Family Ct Act, § 517, subd [b]). It is appellant's contention, however, that the 10-year period is unconstitutional. Appellant acknowledges that several courts have rejected similar contentions and have concluded that the longer limitation period for public welfare officials is not repugnant to either the equal protection or due process clauses of the Fourteenth Amendment. Those courts have found that the longer period is justified by the State's interest in conserving the public purse, and that such interest outweighs the dangers of forcing a putative father to defend a stale claim (see, e.g., *Matter of Van Alstyne v David Q.,* 92 AD2d 971; *Matter of Lydia L. v Vidal L.,* 95 Misc 2d 507; *Matter of Jay v Wolfe,* 76 Misc 2d 680; *Matter of Commissioner of Welfare of City of N. Y. v Jones,* 73 Misc 2d 1014; *Matter of Mores v Feel,* 73 Misc 2d 942). Nevertheless, appellant argues that the 10-year limitation period for public welfare officials violates the due process clause of the Fourteenth Amendment by forcing a putative father to defend a paternity claim long after the fact, when rebuttal evidence has become either unavailable or unreliable. Appellant contends that this hardship on putative fathers was exacerbated by the 1981 amendment to section 532 (L 1981, ch 9, § 2), wherein the Legislature established an exception to the rule permitting use of blood-grouping tests to establish exclusion only. We cannot agree.

A statute is presumed to be constitutional, and that presumption can be overcome only by proof persuasive beyond a reasonable doubt (*Hotel Dorset Co. v Trust for Cultural Resources,* 46 NY2d 358, 370; *Matter of Nuro Transp. v Judges of Civ. Ct. of City of N. Y.,* 95 AD2d 779,

780). Thus, a statute which imposes a period of limitation upon the commencement of a particular type of action will not generally succumb to constitutional challenge upon due process grounds:

" 'The legislative body, in enacting [statutes of limitations], may weigh the conflicting interest between one person's right to enforce an otherwise valid claim and another person's right to be confronted with any claim against him before the lapse of time has likely rendered unavailable or difficult the matter of obtaining or presenting proof. Any balance of these conflicting interests which is not arbitrary or capricious is within the legislative authority and not subject to constitutional attack for lack of due process * * *

" 'Thus the relevant test of due process here is basically the test of reasonableness. If in balancing the conflicting interests of the parties reason can be established, or, stated in reverse, if a lack of arbitrariness can be established * * * no constitutional attack on such legislation would lie.

" '* * * A statute of limitations must be judged in the light of the broad class of cases to which it applies and if it is reasonable with respect to the class; it will not be judged unreasonable merely because it is deemed to operate harshly in a particular or exceptional instance' " (*Matter of Mores v Feel,* 73 Misc 2d 942, 948-949, *supra,* citing *Hargraves v Brackett Stripping Mach. Co.,* 317 F Supp 676, 682-683).

The history of paternity statutes traces back to Elizabethan times. The chief purpose of the Elizabethan Poor Law of 1576 (18 Eliz I, ch 3), the progenitor of modern paternity statutes, was not for the protection of the child, but rather for the indemnification of the parish for the expense of the child's support (*Matter of Lydia L. v Vidal L.,* 95 Misc 2d 507, 511, *supra; Matter of Commissioner of Welfare of City of N. Y. v Jones,* 73 Misc 2d 1014, 1016, *supra*). Thus, the protection of the community against burdensome taxation produced by the acts of the individuals in derogation of public policy was a paramount consideration in the enactment of the modern paternity statutes (see *People ex rel. Kirkpatrick v Crowley,* 25 App Div 175, 176-177; *Matter of Mores v Feel,* 73 Misc 2d 942, 946, *supra*). The Legislature

recognized this strong public interest and concluded, in balancing a public welfare official's right to prosecute an otherwise valid filiation claim against the right of a putative father to be protected from defending a stale claim, that a period of limitation of 10 years after the birth of the child was appropriate (Family Ct Act, § 517, subd [b]). Appellant has clearly failed to show that the Legislature acted unreasonably or arbitrarily in enacting the 10-year Statute of Limitations, and he has therefore failed to meet the burden necessary to rebut the presumption of constitutionality.

Moreover, section 532 of the Family Court Act still authorizes the admission of HLA test results as exclusionary evidence. In cases involving fabricated accusations of paternity, HLA test results are capable of exonerating at least 9 out of every 10 incorrectly accused men. Although this may leave a particular father threatened with a false finding of paternity unless he can marshal evidence to rebut the claim, the State's paramount interest in protecting the public weal nevertheless outweighs the fact that subdivision (b) of section 517 may operate harshly in an exceptional instance. By enacting the 10-year period of limitation, the Legislature manifested an intent that the conservation of public funds should outweigh the potential for harshness to individual putative fathers in exceptional situations, and the 1981 amendment to section 532 does not render unreasonable the original balance struck at the time of the enactment of section 517. To the extent, therefore, that section 517 provides for a 10-year period of limitation, applicable when a public welfare official is the petitioner in a paternity proceeding, that section is not violative of the due process clause, and the instant proceeding is therefore not time barred.

*Equal Protection*

While appellant's constitutional challenge to the Statute of Limitations is premised on due process grounds only, we are cognizant that application of the statute implicates the equal protection clause of the Fourteenth Amendment as well. Just as the interest in avoiding litigation of stale or fraudulent claims is subordinate to the interest in preserving public funds for purposes of due process analysis, the

interest in avoiding litigation of those claims is outweighed by the need to provide the class of children born out of wedlock with a reasonable opportunity to institute paternity proceedings and to establish their right to support. Thus, the Supreme Court of the United States recently held that a one-year Statute of Limitations on support claims by children born out of wedlock violated the equal protection clause by imposing a burden on such children which was not imposed upon legitimate children (*Mills v Habluetzel,* 456 US 91). The court thereafter struck down a two-year Statute of Limitations on similar grounds (*Pickett v Brown,* 462 US __, 103 S Ct 2199). It was largely in response to these decisions that the Legislature of this State amended subdivision (a) of section 517 of the Family Court Act so as to increase the general period of limitation in paternity proceedings from two to five years (L 1983, ch 305, § 1; see Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Part 1, Family Ct Act, § 517, pp 510-511). Significantly, at least one New York court has found that the new five-year Statute of Limitations is unconstitutional under *Pickett v Brown* (*Matter of Patricia R. v Peter W.,* 120 Misc 2d 986). Also, the Supreme Court of the United States recently vacated a judgment of the Supreme Court of Pennsylvania, which approved a six-year Statute of Limitations, and has remanded the case for further consideration in light of *Pickett v Brown* (*Astemborski v Susmarski,* __ US __, 103 S Ct 3105, vacating 499 Pa 99).

In both *Mills v Habluetzel* and *Pickett v Brown* (*supra*), the court applied a two-pronged test to determine whether a Statute of Limitations satisfied the requirements of the equal protection clause. First, the period must be sufficiently long to provide a reasonable opportunity for those with an interest in children born out of wedlock to institute paternity proceedings in their behalf, with due regard for the financial and emotional difficulties faced by the mother following the birth of the child, the possibility of continuing affection for the child's father and the desire to avoid disapproval of family and community (*Mills v Habluetzel,* 456 US 91, 99-100, *supra; Pickett v Brown,* 462 US __, __, 103 S Ct 2199, 2206-2207, *supra*). Second, the time limitation must be substantially related to the State's interest in

avoiding litigation of stale or fraudulent claims. The court noted that a purported State interest in avoiding litigation of such claims would be undercut where the State's Statute of Limitations contained tolling provisions or provisions permitting public welfare officials to institute paternity proceedings long after the mother or child's right to do so had been extinguished. Further, the court concluded that recent scientific advances in blood-group testing had reduced problems of proof in paternity proceedings and had thereby attenuated a State's interest in avoiding stale or fraudulent paternity prosecutions (*Mills v Habluetzel,* 456 US 91, 98-105, *supra; Pickett v Brown,* 462 US __, __, 103 S Ct 2199, 2208-2209, *supra).*

Application of these principles to this case lends no support to appellant's constitutional challenge to the 10-year Statute of Limitations for public welfare officials. The State's purported interest in precluding stale or fraudulent paternity claims has been severely undermined by the advent of the HLA test, by which paternity can be proved or disproved with near certainty regardless of the passage of time since the child's birth. Moreover, the equal protection clause requires that children born out of wedlock be provided with an opportunity to institute paternity proceedings and to establish their right to support that is substantially similar to, although not necessarily coterminous with, the opportunity accorded to legitimate children (*Mills v Habluetzel,* 456 US 91, 97, *supra).* Reduction of the time in which a public welfare official can institute a paternity proceeding on behalf of a child born out of wedlock would only serve to increase the disparity between the opportunity accorded to legitimate children and that accorded to children born out of wedlock.

Accordingly, the order of the Family Court should be affirmed, with one bill of costs.

LAZER, J. P., WEINSTEIN and RUBIN, JJ., concur.

Order affirmed, with one bill of costs.